UNITED STATES of America, Plaintiff,

v.

GALLATIN LIVESTOCK AUCTION, INC., Defendant.

No. 76 CV 60–SJ.

United States District Court, W. D. Missouri, St. Joseph Division.

March 24, 1978.

Kenneth Josephson, Asst. U. S. Atty., Kansas City, Mo., Robert L. Purcell, Dept. of Agriculture, Shawnee Mission, Kan., for plaintiff.

Richard A. Koehler, Donald U. Austin, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, Chief Judge.

In this case the United States seeks to recover from defendant for an alleged conversion. Jurisdiction is based on 28 U.S.C. § 1345 (1970). The action is before the Court for final judgment upon stipulated facts. For the reasons we shall state, we have concluded that the government is entitled to recover the damages it seeks.

### I.

The parties have stipulated the following facts, although they reserve all objections as to materiality and relevancy:

1. The parties admit to the jurisdiction of this Court.

2. The plaintiff, acting through the Farmers Home Administration, made a loan in the amount of $11,410.00 to Albert and Elsie Millsap, evidenced by a promissory note dated April 2, 1974.

2. (a) The loan referenced just above in No. 2 was designated as an Operating Loan by the Farmers Home Administration.

3. To secure the loan from the United States, Albert and Elsie Millsap executed a security agreement dated January 23, 1975, and executed a financing statement filed on October 17, 1973, in the office of the Recorder, Sullivan County, Missouri.

4. During all times material to this lawsuit, Albert and Elsie Millsap resided in Sullivan County, Missouri.

5. The security agreement and financing statement executed by Albert and Elsie Millsap granted to the plaintiff a lien on all livestock then owned or thereafter acquired by the Millsaps.

6. During all times relevant to the facts and transactions of this lawsuit, the defendant Gallatin Livestock Auction, Inc., was conducting a livestock marketing business in Gallatin, Daviess County, Missouri, and was and is a registrant pursuant and subject to the Packers and Stockyards Act, 1921, as amended, 7 U.S.C. Sections 201, *et seq.,* and the regulations relating to the Packers and Stockyards Act as found at 9 C.F.R. Chapter 2.

7. The loan referenced in No. 2 above was sought, approved and administered through the county level office of plaintiff's agency in Milan, Sullivan County, Missouri.

8. The loan referenced in No. 2 above was administered through the County Supervisor, Richard W. Lincoln, of plaintiff's agency in Milan, Missouri.

9. In conjunction with the loan of April 2, 1974, from plaintiff's agency to Albert and Elsie Millsap, the Millsaps in March, 1974, submitted a financial statement to plaintiff's agency through its county office in Milan, Sullivan County, Missouri.

10. On or about mid-September, 1974, Mr. Lincoln gained personal knowledge that Mr. Millsap was indebted to the Princeton State Bank, Princeton, Missouri, in an amount of approximately $8,000.00 for feed that had been purchased since January, 1974.

11. The indebtedness of Mr. Millsap to the Princeton State Bank referenced in No. 10 above was not shown on the financial statement supplied by Mr. and Mrs. Millsap to plaintiff's agency as referenced in No. 9 above.

11. (a) During September and October, 1974, Mr. Lincoln and Mr. Merrill W. Leutung, District Director, exchanged correspondence dealing with such aspects as Mr. Millsap's inability to account for funds related to the loan and the operation of his farm; the omission of other loans and debts from his financial statement; and the advisability of liquidating the Agency's chattel security in the hands of the Millsaps.

12. On or about October 31, 1974, Mr. Lincoln and Mr. Leutung visited with Mr. Millsap at his farm and advised Mr. Millsap to begin liquidating the Agency's security and paying the proceeds to the Agency.

13. Federal regulations found at 7 C.F.R. 1871, *et seq.,* and specifically 7 C.F.R. 1871.7, 1871.8, and 1871.9, set forth the guidelines for the handling of, or dealing with, security pledged for loans from plaintiff's Agency, such as the loan involved in this lawsuit.

14. The livestock listed on the security agreement and/or financing statement of plaintiff's Agency with respect to its loan to the Millsaps are broken down into categories of basic security and normal security per 7 C.F.R. 1871.7 and 1871.8 as follows:

| | | |
|---|---|---|
| (a) | 25 cows | basic security |
| (b) | 22 cows | basic security |
| (c) | 1 steer | normal security |
| (d) | 7 steers | normal security |
| (e) | 1 calf | normal security |
| (f) | 1 boar | basic security |
| (g) | 1 sow | basic security |
| (h) | 8 gilts | basic security |
| (i) | 54 shoats | normal security |
| (j) | 50 shoats | normal security |

15. The categories referenced above in No. 14 are not so specifically denoted on the security agreements or financing statement.

16. A County Supervisor for Farmers Home Administration is authorized to release the lien of the plaintiff on security, whether basic or normal, if (a) the debtor reports the disposition of such property, and (b) the debtor can satisfactorily account for the use of the proceeds of such a disposition as in accordance with the guidelines of 7 C.F.R. 1871.8 and 1871.9.

17. After October 31, 1974, Mr. Millsap did liquidate some of his security property and report the disposition of such property to Mr. Lincoln and satisfactorily account for

the use of the proceeds of such disposition to Mr. Lincoln.

17. (a) The sales referenced above in No. 17 involved chattel security/livestock and were accomplished by Mr. Millsap without the prior written consent of the FmHA.

18. On February 5 and February 19, 1975, Mr. Millsap consigned livestock for sale through the facilities and with the assistance of the defendant Gallatin Livestock Auction, Inc.

19. On February 5, 1975, the defendant issued its check to E. G. Millsap in the amount of $2,411.22 which represented the net sale proceeds for 53 mixed shoats.

20. On February 5, 1975, the defendant issued its check to A. E. Millsap in the amount of $978.01 which represented the net sale proceeds for 10 sows and one boar.

21. On February 19, 1975, the defendant issued its check to A. E. Millsap in the amount of $1,476.10 which represented the net sale proceeds for 3 sows, 24 pigs, 1 bull, 5 steers, and 9 cows.

22. The defendant Gallatin Livestock Auction, Inc., sold the livestock in issue for Albert and Elsie Millsap on a commission basis.

23. The relationship of the defendant to A. E. and E. G. Millsap in the transactions of February 5 and 19, 1975, as referenced above in Nos. 18, 19, 20, and 21 was that of agent and principal.

23. (a) The livestock referenced in Nos. 19, 20, and 21 above were brought to the defendant's facilities at the request and/or under the direction and control of A. E. Millsap and/or E. G. Millsap.

23. (b) The livestock referenced in Nos. 19, 20, and 21 above were sold by the defendant at the direction and/or request of A. E. Millsap and/or E. G. Millsap.

23. (c) Prior to the actual appearance of the livestock referenced in Nos. 19, 20, and 21 above at the facilities of defendant Gallatin Livestock Auction, Inc., the defendant had no knowledge, actual or constructive, through either its officers or employees, that A. E. Millsap or E. G. Millsap desired to have the referenced livestock sold.

24. Defendant did not have actual knowledge of the security agreement and financing statement between plaintiff's Agency and the Millsaps as referenced in No. 3 above.

25. The plaintiff United States of America received none of the proceeds from the sale of livestock of February 5 or February 19, 1975.

26. The plaintiff did not, in writing, release its lien on the livestock sold by the defendant for Albert and Elsie Millsap on February 5, 1975, and February 19, 1975.

26. (a) Sometime in the latter part of February, 1975, or early March, 1975, Mr. Lincoln discovered that the Millsaps were no longer operating their farm.

26. (b) On March 25, 1975, the FmHA completed a liquidation of its chattel security remaining in the possession of the Millsaps by way of a public sale held at the site of the Millsaps' farm and properly accounted to the Millsaps for the funds from such disposition.

27. As of September 1, 1976, a balance of principal and interest of $5,635.45 remained unpaid on the promissory note referred to in paragraph 2 above.

28. Albert and Elsie Millsap were engaged in farming operations and the livestock sold for them by the defendant were farm products at the time of their sale on February 5 and 19, 1975.

29. On June 13, 1975, Albert E. and Elsie G. Millsap filed petitions in bankruptcy in the Western District of Missouri, Nos. 75–B–1225–W–2 and 75–B–1226–W–3.

30. The debt referenced in plaintiff's complaint at paragraphs 3, 4, and 5 from the Millsaps to plaintiff's Agency was listed by the Millsaps in their respective bankruptcy proceedings.

31. Plaintiff's Agency had actual knowledge of the bankruptcy proceedings of its borrowers/debtors Albert E. and Elsie G. Millsap.

32. Albert E. and Elsie G. Millsap received their respective discharges in bankruptcy as of August 8, 1975.

33. The debt referenced in plaintiff's complaint at paragraphs 3, 4, and 5 from the Millsaps to plaintiff's Agency was among those debts of the Millsaps from which they were discharged in bankruptcy.

34. Plaintiff's Agency made no application to have its debt from the Millsaps declared nondischargeable per the provisions of Sections 17 and 14 of the Bankruptcy Act, 11 U.S.C. Sections 35 and 32.

35. The 106 head of livestock referenced in Nos. 18, 19, 20 and 21 above were owned by the Millsaps and such livestock were subject to the security instruments of the plaintiff, as referenced in No. 3 above.

35. (a) On July 14, 1975, at the first meeting of creditors in the bankruptcy of Albert E. Millsap, No. 75–B–1225–W–2, Western District of Missouri, Mr. Millsap testified that "Hog money—$4,865.00—received—used to pay feed bills; 14 hfrs Cattle brght $3,200—all turned over to FHA; 6–cattle $1,007.12; 18 head sold for 1900–".

## II.

The central legal question in this suit was articulated by the government: whether defendant Gallatin Livestock Auction, Inc., as a commission merchant or an agent or a market agency, is liable to plaintiff in conversion for selling livestock encumbered by the security instruments of plaintiff, and paying the proceeds directly to Albert or Elsie Millsap. In addition to the basic issue, defendant has raised numerous legal questions which we will resolve in the course of this opinion.

The stipulated facts reflect that the government perfected a security interest in the Millsaps' livestock to secure a loan from the Farmers' Home Administration. *See generally* Article 9, U.C.C., Rev.Stat. Mo. §§ 400.9–101 to 400.9–507 (Vernon's 1965). On October 31, 1974, Mr. Millsap was orally advised by local officials of the Farmers' Home Administration to begin selling the livestock in which there was a security in-

terest and paying the proceeds to the agency. Thereafter, Mr. Millsap did liquidate some of the secured property and satisfactorily accounted for the proceeds.

In February, 1975, the Millsaps sold some of the secured property through defendant's livestock auction, which received a commission for its services. The government agency received none of the proceeds from this sale.

On August 8, 1975, the Millsaps were adjudged bankrupts and their debts were discharged. The United States did not pursue its rights against the Millsaps in the bankruptcy proceedings. This suit was filed on October 12, 1976.

In our order of October 12, 1977, denying defendant's motion to dismiss, we cited the leading Missouri case holding an auctioneer liable for the sale of livestock in which there was a security interest. *See Farmer's State Bank v. Stewart*, 454 S.W.2d 908, 915 (Mo. banc 1970):

> The almost universally accepted rule is that an agent . . . or auctioneer who receives property from his principal and sells it and pays the proceeds of the sale to him is guilty of conversion if the principal has no right to sell the property, even though the agent acts without knowledge of the defect in title.

Defendant strenuously argues that this case and the Missouri rule of decision it represents should not apply to this suit. Although defendant recognizes that our controlling Court of Appeals recently held that state law applies to this transaction, *see United States v. Chappell Livestock Auction*, 523 F.2d 840 (8th Cir. 1975); *United States v. Kramel*, 234 F.2d 577 (8th Cir. 1956), it contends that because the security interests are governed in part by federal regulations a federal common law should apply. Defendant correctly notes that a majority of the Courts of Appeal would apply some sort of a federal law to this transaction.* This Court is not free to ig-

---

* We note that applying "federal law" to these security interests would not help defendant at all. The federal rule is also that an auctioneer is liable for the sale of livestock in which there is a security interest held by the government. *See, e. g., Cassidy Commission Co. v. United*

nore the controlling holding of our Court of Appeals, however, and we therefore find and conclude that Missouri law applies to this transaction.

### III.

Defendant's basic position in this case is that it cannot be liable for conversion for two reasons: (1) there could have been no "conversion" of the secured property until the Millsaps failed to account to the Agency for the proceeds; and (2) because it is only an agent for the Millsaps. We disagree with defendant's analysis of the applicable law.

■ Defendant's contention that it takes two acts to create a conversion—the sale to the auctioneer and the failure to account for the proceeds properly—is not in accordance with Missouri law. As *Farmer's State Bank, supra,* demonstrates, under Missouri law the tort of conversion is completed by the mere sale of livestock in which there is a security interest. At common law, conversion was a tort of strict liability, *see United States v. Chappell Livestock Auction, Inc., supra,* 523 F.2d at 842 n. 3 (8th Cir. 1975), and *Farmer's State Bank* confirms that that aspect of the doctrine is still valid.

Defendant's argument that two acts are required is a non sequitur. While it is true that the government could not recover from defendant if the Agency had received the proceeds from the Millsaps, it does not follow that Missouri law requires two acts for an auctioneer to be liable for conversion. An analysis in accordance with the Missouri rule of decision would suggest that under the assumed circumstances a conversion occurs when livestock are sold, but liability is waived by the agency's acceptance of the proceeds.

■ Defendant's second major point, that it was only the Millsap's agent and should not be held liable if the Millsaps are not liable, is also erroneous. The very purpose of a system of security interests is to protect the investment of creditors in debtors who fail to pay their debts. While defendant may feel unfairly burdened with a loss directly caused by the Millsaps' failure to account for the proceeds, it could have protected itself by checking to see if a financing statement filed in the Recorder's office in Sullivan County, Missouri, secured an interest in the Millsaps' livestock.

■ The central rebuttal to defendant's "agency" argument, however, is that a converter of secured property is strictly liable for that tort. *See United States v. Chappell Livestock Auction, Inc., supra.* This is why we have noted in prior opinions that defendant is primarily and not derivatively liable, even though *Farmers State Bank* does not use those terms. We have examined defendant's authorities and have found nothing inconsistent with this holding.

Defendant's statement in its brief that we previously "held" that defendant could not be indemnified by the Millsaps is inaccurate. Rather, in our opinion of October 12, 1977, we ordered defendant to brief its theory of indemnification before we would allow it to bring in the bankrupt Millsaps. In its responsive filing, defendant cited general agency principles which had been applied in Missouri cases. We agree that defendant is likely to have a right of indemnification, but our concern is that those general principles might not apply when the debtor's liabilities have been discharged in bankruptcy. Because that precise question of Missouri law was not addressed by defendant in its prior filing and because the question of indemnity might have been mooted by other issues in the case, we denied defendant's motion to file a third party complaint without prejudice. We have not ruled the question of whether the Millsaps are liable to indemnify defendant, an issue which could be ruled most appropriately by the state courts should defendant decide to seek a judgment against the bankrupt Millsaps.

*States,* 387 F.2d 875 (10th Cir. 1967); *United States v. Carson,* 372 F.2d 429 (6th Cir. 1967).

*See also* 7 C.F.R. 1871.22(b)(4)(v), 41 Fed.Reg. 228 (effective November 24, 1976).

Defendant might have been relieved of liability had it been able to show that the government had released its lien on the secured property. The stipulation of the parties reflects that government agents orally advised Mr. Millsap "to begin liquidating the agency's security and paying the proceeds to the agency." It is also stipulated that the government did not release its lien in writing, as required by the security agreement.

 We find and conclude that defendant has not shown that the government released its lien. Defendant has cited to the Court federal regulations which allow agents of the Farmers Home Administration to release chattel security orally. *See, e. g.,* 7 C.F.R. § 1871.8 (1976). Those regulations are quite narrowly written, however, to maintain the government's security interest in the proceeds from the sale of the chattel. Defendant has raised no valid release defense.

Finally, defendant claims that "the law in this area is not in perspective with the realities of the situation in question" and that "[t]his Court has an apportunity [sic] to change that." It complains that it had only constructive knowledge of the lien and that Mr. Millsap, and not defendant, was dishonest. Finally, defendant asks for a "reasoned analysis and a realization of the whole circumstances involved" and a "more reasoned and logical approach to the issues and questions which this cause presents."

 Although defendant may not be pleased with what it believes is a harshness of the legal principles that the Court is under obligation to apply, it is nonetheless our duty to follow the rules of decision of the Court of Appeals for the Eighth Circuit and, in this case, the Missouri Supreme Court. Defendant's hope that we will "balance the interests" and change the rule of decision should be addressed to the Missouri General Assembly or the Missouri Supreme Court or to our controlling Court of Appeals. We may only rule that under applicable law, defendant is liable to the government for the tort of conversion.

Accordingly, and for the reasons stated, it is

ORDERED that defendant shall be liable to plaintiff in the amount of $5,039.35 plus interest. Each party shall bear its own costs.